UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
AKF, INC. d/b/a FUNDKITE,

                Plaintiff,

       - against -

WESTERN FOOT & ANKLE CENTER, A
PODIATRY CORPORATION, and WESTERN
PODIATRY RESIDENCY DEVELOPMENT
AND MANAGEMENT, INC., and EDWARD
SONG WOO RHEE,
                Defendants.
--------------------------------------------------------x

**MEMORANDUM & ORDER**
19-CV-7118 (PKC) (ST)

PAMELA K. CHEN, United States District Judge:

Pending before the Court is the motion of Plaintiff AKF, Inc. d/b/a Fundkite ("AKF") for partial summary judgment on the issues of breach of contract and guaranty under New York law. Defendants—Western Foot & Ankle Center, a Podiatry Corporation ("Western-1"), Western Podiatry Residency Development and Management, Inc. ("Western-2"), and Doctor Edward Song Woo Rhee ("Dr. Rhee")—oppose the motion on narrow grounds, including that a material factual dispute exists, certain discovery was withheld, and the contract was usurious. For the reasons stated herein, the Court finds that, even though the undisputed evidence establishes breach of contract by one or more of Defendants, because the contract was usurious, Plaintiff's motion is denied.

1

## BACKGROUND[1]

Dr. Rhee, a California based medical doctor, is the sole owner of California entities Western-1 and Western-2.  (Ex. A, Dkt. 46-5, at 16, 21; Pl.'s 56.1, Dkt. 46-2 ¶ 10; Ex. H, Dkt 46-12, Resp. Interrog. 8.)[2]  On October 17, 2019, AKF and Western-1 entered into an agreement entitled "Revenue Purchase Agreement" (the "RPA"), which the parties agreed would be governed by New York law.  (Pl.'s 56.1, Dkt. 46-2, ¶ 1; Ex. A, Dkt. 46-5, ¶ 4.5.)  Pursuant to the RPA, on October 18, 2019, AKF paid Western-1 a lump sum of $93,614.  (Pl.'s 56.1, Dkt. 46-2, ¶¶ 3, 12; Ex. E, Dkt. 46-9, at 2.)  In exchange, the RPA required Western-1 to "sell[], assign[,] and transfer[]" to AKF fourteen percent (14%) of its:

> [F]uture sales, accounts, contract rights and other obligations and entitlements arising from or relating to the payment of monies from [Western-1's] customers to and/or third party payers (the "**Receipts**") including, but not limited to all payments made by cash, check

---

[1]  The Background section is based on the parties' statements and exhibits filed pursuant to Local Rule 56.1.  Assertions of fact which are "[]supported in the record," and Defendants failed to properly controvert, are "deemed admitted."  *Giannullo v. City of N.Y.*, 322 F.3d 139, 140 (2d Cir. 2003) (citations omitted).  Because "[l]egal arguments are impermissible in any Rule 56.1 Statement and are to be disregarded," *Taveras v. HRV Mgmt., Inc.*, No. 17-CV-5211 (SJB), 2020 WL 1501777, at *2 (E.D.N.Y. Mar. 24, 2020), the Court ignores the parties' dueling assertions as to the character and meaning of their contract (including its status as a loan).  (*See, e.g.*, Dkt. 45-2, ¶¶ 2, 8, 10, 19.); *see also Rodriguez v. Schneider*, No. 95-CV-4083 (RPP), 1999 WL 459813, at *1 n.3 (S.D.N.Y. June 29, 1999) ("Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record. They should not contain conclusions[.]" (emphasis omitted)).  The Court likewise disregards assertions and denials that are wholly untethered to the record or unsupported by relevant evidence.  *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) ("[W]here there are no citations or where the cited materials do not support the factual assertions in the [s]tatements, the Court is free to disregard the assertion." (cleaned up)); *Gonzalez v. Allied Concrete Indus., Inc.*, 575 F. Supp. 3d 336, 339 (E.D.N.Y. 2021) ("A party may not rest on a mere denial without citing supporting admissible evidence.").

[2]  Together with its 56.1 Statements, each party attached an identical copy of the RPA and described it as the parties' operative agreement (*compare* Dkt. 45-1, *with* Dkt. 46-2).  Thus, the existence and contents of the RPA, as to all its parts, are undisputed facts for the purposes of this motion.  Unless otherwise stated, all citations to Ex. A, Dkt. 46-5, are confined solely to the Revenue Purchase Agreement ("RPA"), spanning pages one to twelve, and do not refer to the guaranty and other documents which appear within it.

electronic transfer or other form of monetary payment in the ordinary course of [Western-1's] business . . . [until AKF was paid $130,545].

(Ex. A, Dkt. 46-5, at 5; *see also* Pl.'s 56.1, Dkt. 46-2, ¶ 2.)  The RPA did not specify a time period by which the $130,545 had to be paid in full.

In lieu of calculating and timely transferring 14% of its Receipts on a daily basis, Western-1 chose to deposit a daily, pre-set sum of $888.06 to a Union Bank account that AKF agreed to debit (in its entirety) on "each business day Monday to Friday."  (Ex. A, Dkt. 46-5, at 4–6.)  This "Alternative Daily Amount" agreed to by the parties under the RPA was "intended to represent [14%] of the Receipts."  (Pl.'s 56.1, Dkt. 46-2, ¶¶ 5–6.)

On October 17, 2019, Dr. Rhee and Western-2 executed a guaranty for Western-1's performance under the RPA.  (Pl.'s 56.1, Dkt. 46-2, ¶¶ 10–11.)  Dr. Rhee's and Western-2's obligations as guarantors became due "at the time of any breach by [Western-1]."  (*Id*. ¶ 11.)  Such breach on Western-1's side would constitute an "Event of Default" under the RPA.  (Ex. A, Dkt. 46-5, ¶ 3.1(a).)  An Event of Default entitled AKF to immediate possession of all of Western-1's Receipts (*id.* at 5); to the full sum of $130,545 (*i.e.*, the full amount Western-1 should have paid AKF under the RPA), and punitive fees that became due immediately (*id*. ¶ 3.2).  And, because the RPA constituted an "assignment of [the] lease of [Western-1's] business premises," an Event of Default also entitled AKF to "exercise rights" on the lease "without prior notice."  (*Id*.)  Absent an Event of Default, once a month, Western-1 could request to "reconcile" with AKF and adjust the Alternative Daily Amount to reflect the true value of 14% of Western-1's Receipts.  (*Id*. at 5.)  Requests to reconcile had to be submitted through certified mail.  (*Id*. at ¶ 4.3.)  Prior to any reconciliation, Western-1 had to "provide [AKF] with" its "monthly bank statements and any other information requested by [AKF]."  (*Id*. at 7–8.)  But after "receipt and reasonable verification" of all such information, AKF was required to reconcile with Western-1 by:

either crediting or debiting the difference from or back to [Western-1's] bank account so that the amount debited in the immediately preceding calendar month equal[ed] [14%] of [Western-1's] actual Receipts for that calendar month. [AKF] also [had to] adjust the Alternative Daily Amount on a going-forward basis to more closely reflect [Western-1's] actual Receipts times [14%]. [AKF] [would] give [Western-1] notice five business days prior to any such adjustment. After each adjustment made pursuant to [Paragraph 4.3 of the RPA], the new dollar amount [would] be deemed the Alternative Daily Amount until any subsequent adjustment.

(*Id.* at 5.)

Finally, the RPA contained a disclaimer provision titled "**Non-Recourse Sale of Future Receipts (THIS IS NOT A LOAN)**":

[Western-1] is selling a portion of a future revenue stream to [AKF] at a discount, not borrowing money from [AKF]. There is no interest rate or payment schedule and no time period during which the [$130,545] must be collected by [AKF]. If Receipts are remitted more slowly than [AKF] may have anticipated or projected because [Western-1's] business has slowed down, or if the full [$130,545] is never remitted because [Western-1's] business went bankrupt or otherwise ceased operations in the ordinary course of business, and [Western-1] has not breached this Agreement, [Western-1] would not owe anything to [AKF] and would not be in breach of or default under this Agreement. [AKF] is buying the [$130,545] of Receipts knowing the risks that [Western-1's] business may slow down or fail, and [AKF] assumes these risks based on [Western-1's] representations, warranties and covenants in this Agreement that are designed to give [AKF] a reasonable and fair opportunity to receive the benefit of its bargain. By this Agreement, [Western-1] transfers to [AKF] full and complete ownership of the [$130,545] of Receipts and [Western-1] retains no legal or equitable interest therein. [Western-1] will treat the . . . [$130,545] in a manner consistent with a sale in its accounting records and tax returns.

(*Id.* ¶ 1.2.)

On October 21, 2019, AKF began charging Western-1 the Alternative Daily Amount. (Pl.'s 56.1, Dkt. 46-2, ¶¶ 13–14.; Ex. E, Dkt. 46-9, at 5.)  Within less than two months, AKF debited Western-1's Union Bank account for $35,522.40.  (*See generally* Ex. E, Dkt. 46-9.)[3]  On

---

[3] Although Dr. Rhee contends that "records" prove that he actually paid AKF $40,117.05, instead of $35,522.40, during this period and that he never received from AKF a statement regarding third-party payments on Western-1's behalf (Dkt. 45-2, ¶ 17), Dr. Rhee's statement is based on portions of his deposition that discuss neither records nor third-party payees (*see* Dr. Rhee Deposition Transcript ("Dr. Rhee Dep."), Dkt. 46-6, 162:1–5).  The Court deems the

4

November 13, 2019, despite the RPA's prohibition on "enter[ing] into . . . [an] agreement . . . that relates to. . . Receipts" with "any party" (Ex. A, Dkt. 46-5, ¶ 2.10), Western-1 signed a "Sale of Purchased Future Receipts" agreement with an entity named West Coast Business Capital, LLC ("WCB") (*see* Pl.'s 56.1, Dkt. 46-2, ¶ 18; Ex. I, Dkt. 46-13, ¶ 3).  Five days later, WCB paid Western-1 $70,462, and proceeded to charge the Union Bank account $18,772.  (Ex. J, Dkt. 46-14, at 2–16.)  On or about December 17, 2019, despite the RPA's prohibition on "block[ing]" AKF from debiting the Union Bank account (Pl.'s 56.1, Dkt. 46-2, ¶ 8; Ex. A, Dkt. 46-5, ¶ 3.1(j)), Dr. Rhee contacted Union Bank and terminated AKF's ability to debit Western-1  (Pl.'s 56.1, Dkt. 46-2, ¶ 14).  The Union Bank account remains inaccessible to AKF.  (Pl.'s 56.1, Dkt. 46-2, ¶ 16.)  After some time, Western-2 was "suspended from operating in the state of California," and Western-1 signed another Sale of Receipts agreement and accumulated $921,900 in additional debt.  (Ex. H, Dkt 46-12, Resps. Interrogs. 2, 13.)

On December 19, 2019, AKF initiated this lawsuit alleging breach of contract and breach of guaranty, for which AKF seeks $136,850.28 in damages (Complaint ("Compl."), Dkt. 1, ¶¶ 26–41, Prayer (i)–(ii)), and unjust enrichment and "money had and received," for which AKF seeks $97,686.76 in damages (*Id.* ¶¶ 42–57, Prayer (iii)–(iv)).  Discovery ended on August 15, 2020.

---

statement unsupported by the record and disregards it.  *See, e.g.*, *I.M. v. United States*, 362 F. Supp. 3d 161, 179 (S.D.N.Y. 2019) (disregarding a 56.1 Statement when the "portion of [the] deposition transcript [cited] to d[id] not support [the] proposition."); *McGrier v. City of New York*, No. 16-CV-5667 (VEC), 2019 WL 1115053, at *2 n.2 (S.D.N.Y. Mar. 11, 2019) (rejecting a 56.1 Statement where "[t]he cited page of [the] deposition d[id] not support [it]."), *aff'd*, 849 F. App'x 268 (2d Cir. 2021) (summary order); *Anilao v. Spota*, 340 F. Supp. 3d 224, 237 n.10 (E.D.N.Y. 2018) (disregarding a 56.1 Statement when "review of the deposition pages cited by [defendants] and the surrounding testimony reveal[ed] that the cited materials do not support [it]."), *aff'd*, 27 F.4th 855 (2d Cir. 2022).  The Court instead relies on the identical, uncontested Union Bank account statements to determine payments made from the Union Bank account to AKF.  (*Compare* Ex. E, Dkt. 46-9, *with* Ex. F., Dkt. 45-1, at 62–98.).

(03/05/2020 Order.) In March 2021, AKF filed the present motion for summary judgment as to its breach of contract and guaranty claims, which Defendants oppose. (Dkts. 45, 46, 47.)

## STANDARD OF REVIEW

Summary judgment is proper only when "the movant shows that there is no genuine dispute as to any material fact and movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Gonzalez v. City of Schenectady*, 728 F.3d 149, 154 (2d Cir. 2013); *New York v. Mountain Tobacco Co.*, 942 F.3d 536, 541 (2d Cir. 2019) (same). Once this burden is met, the burden shifts to the nonmoving party to proffer some evidence establishing the existence of a question of material fact that must be resolved at trial. *See Spinelli v. City of New York*, 579 F.3d 160, 166–67 (2d Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 13 F.4th 247, 259 (2d Cir. 2021). "To present a 'genuine' issue of material fact sufficient to defeat a motion for summary judgment, the record must contain contradictory evidence 'such that a reasonable jury could return a verdict for the nonmoving party.'" *Horror Inc. v. Miller*, 15 F.4th 232, 241 (2d Cir. 2021). A mere "scintilla of evidence" in support of the nonmoving party is insufficient; "there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 143 (2d Cir. 2013); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) ("[T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." (cleaned up)). "In deciding a motion for summary judgment, a court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (internal quotation marks omitted).

6

## DISCUSSION

### I.    Plaintiff Has Established a Breach of Contract

Based on the undisputed evidence, Plaintiff has established a contractual breach under New

York law.[4]  Under New York law, breach of contract is established where the following facts are

proved: "the existence of a contract, the plaintiff's performance pursuant to the contract, the

defendant's breach of its contractual obligations, and damages resulting from the breach[.]"  *PFM*

*Packaging Mach. Corp. v. ZMY Food Packing, Inc*., 16 N.Y.S. 3d 298, 299–300 (App. Div. 2015)

(citations omitted); *143 Bergen St., LLC v. Ruderman*, 42 N.Y.S. 3d 252, 254 (App. Div. 2016)

(same); *see also Awards.com, LLC v. Kinko's, Inc*., 834 N.Y.S. 2d 147, 155 (App. Div. 2007) ("[A

party's] subjective intention or willingness to perform its obligations is irrelevant; the issue is

---

[4] As a threshold matter, as Defendants' opposition raises only the defense of criminal usury under New York law and omits all other defenses mentioned in the Answer, the Court deems all unraised defenses abandoned for the purposes of this motion.  *See Kovaco v. Rockbestos-Surprenant Cable Corp*., 834 F.3d 128, 143 (2d Cir. 2016); *Taylor v. City of New York*, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003); (*compare* Answer ("Ans."), Dkt. 7, *with* Dkt. 45.)   Similarly, the Court denies Defendants' request to forestall the decision on this motion.  (Dkt. 45, at 9–10.) First, the Court finds fanciful the argument that judicial economy is offended by the common device of partial summary judgment (*id.*), and illogical the argument that the existence of a factual dispute as to claims not subject to this motion precludes granting this motion (*id.*).  Second, the Court rejects Defendants' argument that discovery violations preclude a decision on this motion. "[A] party resisting summary judgment on the ground that it needs discovery in order to defeat the motion must submit an affidavit showing (1) what facts are sought [to resist the motion] and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what effort affiant has made to obtain them, and (4) why the affiant was unsuccessful in those efforts."  *Gurary v. Winehouse*, 190 F.3d 37, 43 (2d Cir. 1999) (cleaned up) (brackets in original).  Defendants' utter failure to submit the required affidavit, or take any action to obtain discovery they now claim was improperly denied—*e.g.*, pursue a timely Federal Rule of Civil Procedure 37 motion or raise the issue during discovery—render their argument meritless. *Id.* at 43–44 ("[T]he failure to file [] an affidavit is fatal to a claim . . . even if the party resisting the [summary judgment] motion . . . alluded to a claimed need for discovery in a memorandum of law."); *Williams v. R.H. Donnelly Corp.*, 368 F.3d 123, 126 n.1 (2d Cir. 2004) ("[failure to file an affidavit is] itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate" (quotation marks and citations omitted)).

whether [the party acted pursuant to the contract], not whether [the party] was willing or able to do so[.]"), *aff'd*, 925 N.E.2d 926 (N.Y. 2010).

Dr. Rhee's attempt to create a factual dispute on the basis that, in his view, the parties' contract was a loan is meritless. "A contract['s] . . . meaning and intent present questions of law only," *Dwight v. Germania Life Ins. Co.*, 8 N.E. 654, 658 (N.Y. 1886), and, thus, Dr. Rhee's view or belief that the contract is a loan raises a legal, not a factual, dispute, *see LG Funding, LLC v. United Senior Props. of Olathe, LLC*, 122 N.Y.S.3d 309, 312 (App. Div. 2020) (finding that to determine whether an instrument is a loan, "*a court* must examine whether the plaintiff is absolutely entitled to repayment under all circumstances" (emphasis added) (cleaned up)). Similarly, whether any alleged loan was usurious is a question of law. *See Hartley v. Eagle Ins. Co. of London, Eng*., 222 N.Y. 178, 185 (1918) (noting that the court below found as a "conclusion of law, that the transaction was a loan under which the plaintiff was to repay the defendant more than [the allowed interest rate]."); *see also Provident Life & Tr. Co. v. Fletcher*, 237 F. 104, 108 (S.D.N.Y. 1916) ("[Q]uestions of fact [having] be[en] disposed of, the first question of law which arises is whether the transaction . . . was usurious [under New York law.]"), *aff'd*, 258 F. 583 (2d Cir. 1919); *Power Up Lending Grp., Ltd. v. Cardinal Energy Grp., Inc*., No. 16-CV-1545 (DRH) (GRB), 2019 WL 1473090, at *6 (E.D.N.Y. Apr. 3, 2019) (finding that whether an agreement was a loan at a usurious interest rate was a "question[] of law, not fact[.]"); *In re GMI Grp., Inc*., 606 B.R. 467, 486 (Bankr. N.D. Ga. 2019) (analyzing the existence of usury under New York law as a question of law).

It is well-established law that the Court may decide all questions of law on summary judgment.[5]  *See New York State Guernsey Breeders' Co-op. v. Wickard*, 141 F.2d 805, 810 (2d Cir. 1944) ("Since on this record only questions of law were involved, summary judgment was proper."); *Flair Broad. Corp. v. Powers*, 733 F. Supp. 179, 184 (S.D.N.Y. 1990) ("[D]isputed legal questions present nothing for trial and are appropriately resolved on a motion for summary judgment." (cleaned up)); *Benjamin v. Traffic Exec. Ass'n E.R.R.*, 869 F.2d 107, 115 n.11 (2d Cir. 1989) (same).  Thus, to the extent the material facts are undisputed, it is appropriate for the Court to decide whether the RPA was a usurious loan, as Defendants assert as a defense to Plaintiff's breach of contract and guaranty claims.

The undisputed facts demonstrate that Dr. Rhee's decision to block the Union Bank account and Western-1's decision to contract with WCB each constituted a contractual breach. First, as Defendants do not contest in their opposition papers that a contractual breach occurred— despite doing so in their Answer (*see* Ans., Dkt. 7, ¶ 7)—any such defense is abandoned, and summary judgment is appropriate.  *Maher v. All. Mortg. Banking Corp.*, 650 F. Supp. 2d 249, 267 (E.D.N.Y. 2009) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way." (collecting cases)); *Jackson v. Fed. Express*, 766 F.3d 189, 198 (2d Cir. 2014) ("[I]n the case of a counseled party, a court may, when appropriate, infer from a party's partial opposition

---

[5]  Even had Dr. Rhee's view as to the contract's meaning created a factual dispute, that dispute would be immaterial.  Under New York law, contractual "ambigui[ty]" is a legal question, and when a court deems the contractual language clear, "[e]vidence outside [its] four corners" is generally "inadmissible[.]"  *W.W.W. Assocs., Inc. v. Giancontieri*, 566 N.E.2d 639, 642 (N.Y. 1990).  The Court finds the RPA unambiguous, and consequently Dr. Rhee's statements are not "facts that might affect the outcome of the suit under the governing law[.]"  *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013); *see also First Int'l Bank of Israel, Ltd. v. L. Blankstein & Son, Inc*., 449 N.Y.S.2d 737, 738–39 (App. Div. 1982) ("[T]he [contract] speaks for itself . . . [p]arol evidence is inadmissible to vary the terms of the written instrument.").

that relevant claims or defenses that are not defended have been abandoned."). Second, and regardless, a contractual breach conclusively appears on the face of this record. The undisputed facts establish the existence of the RPA, which required AKF to transfer a lump-sum of $93,614.00 to Western-1. The RPA prohibited Western-1 from "enter[ing] into . . . [an] agreement . . . that relates to. . . [the] Receipts" with "any party" and from "block[ing]" AKF from debiting the Union Bank account (*see* Dkt. 46-5, ¶¶ 2.10, 3.1(j)). Despite these explicit prohibitions, Western-1 entered into a Sale of Receipts agreement with WCB, and Dr. Rhee blocked AKF from accessing and debiting the Union Bank account. To date, AKF has charged the Union Bank account only $35,522.40 out of the $130,545 that Western-1 promised to pay AKF under the RPA.

The Court therefore finds, as a matter of law, that Plaintiff has established a breach of contract by Defendants.

## II.   Plaintiff Has Established a Breach of Guaranty

Based on the undisputed evidence, Plaintiff has also proved a breach of guaranty by Defendants under New York law. "[T]o recover on a guarantee under New York law, [a claimant must show] (1) that it is owed a debt from a third party; (2) that the defendant made a guarantee of payment of the debt; and (3) that the debt has not been paid by either the third party or the defendant." *Chem. Bank v. Haseotes,* 13 F.3d 569, 573 (2d Cir. 1994) (citations omitted); *accord City of N. Y. v. Clarose Cinema Corp.*, 681 N.Y.S.2d 251, 253 (App. Div. 1998) ("[What the] creditor need[s to] prove is an absolute and unconditional guaranty, the underlying debt, and the guarantor's failure to perform under the guaranty[.]" (citations omitted)). Defendants again do not contest or respond to the allegation that they breached the guaranty in their opposition papers. (*See generally* Dkt. 45.) Any defense is therefore waived. Defendants' breach of guaranty is also apparent on the face of the undisputed record. Pursuant to the RPA, Western-1 owed a debt to

AKF (Dkt. 46-2, ¶ 17); Western-2 and Dr. Rhee signed a guaranty, whose terms are not disputed, guaranteeing payment of that debt (*id.* ¶¶ 10–11); and the debt is outstanding (*id.* ¶ 17).

The Court therefore finds, as a matter of law, that Plaintiff has established a breach of guaranty by Defendants.

### III.   Defendants Have Established the Defense of Usury

Based on the undisputed evidence, Defendants have established a defense of criminal usury to the breach of contract and guaranty claims, which vitiates Defendants' liability[6] and defeats summary judgment on those claims.[7]   To prove the defense of criminal usury under New York law, "a debtor must allege and prove by clear and convincing evidence that [(1)] a loan or forbearance of money, [(2)] requiring interest in violation of [the criminal] usury statute, [(3)] was charged by the holder or payee with the intent to take interest in excess of the legal rate [of 25% per annum]."   *Blue Wolf Cap. Fund II, L.P. v. Am. Stevedoring Inc.*, 961 N.Y.S.2d 86, 89 (App. Div. 2013) (citations omitted); N.Y. Penal Law § 190.40 (McKinney 2022) (making it unlawful to charge interest on a loan "at a rate exceeding twenty-five per centum per annum[.]").   "Under

---

[6] The dispositive impact of Defendants establishing their usury defense is discussed *infra* at 22–23.

[7] The Court elects to construe Defendants' ambiguous opposition broadly.  Defendants advance the erroneous contention that the existence of a usurious loan is a factual dispute, along with other arguments, including that the Court must determine the "transaction's purpose by its true character under all circumstances," and that the RPA is a loan made at "a criminal 35% interest rate."  (Dkt. 45, at 4–6.)  Because Defendants asserted the defense of usury in their Answer, and have "consistently averred that the [a]greement was a usurious [loan] in violation of New York Penal law" (*id.* at 6), the Court construes the pleadings broadly as stating that the defense of usury is at issue with respect to this partial summary judgment motion.  *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 909 n.10 (1990) (noting that motions are to be construed according to their substance, not by reference to any nomenclature); *Gins v. Mauser Plumbing Supply Co*., 148 F.2d 974, 976 (2d Cir. 1945) ("[P]articular legal theories of counsel yield to the court's duty to grant the relief to which the prevailing party is entitled, whether demanded or not"); *Newman v. Silver*, 713 F.2d 14, 15 n.1 (2d Cir. 1983) (upholding district court's decision to try a case based on a legal theory not in the complaint when its factual basis was pleaded).

11

[New York law], the defense of [civil] usury [(i.e., interest over 16%)] is not available to corporations, but this bar does not preclude a corporate borrower from raising the defense of "criminal usury" (i.e., interest over 25%) in a civil action[.]" *See Adar Bays, LLC v. GeneSYS ID, Inc.*, 179 N.E.3d 612, 616 (N.Y. 2021). On summary judgment, a debtor may meet its "burden of proof simply by submitting the [contract] evidencing the usurious transaction." *Funding Grp., Inc. v. Water Chef, Inc.*, 852 N.Y.S.2d 736, 740 (Sup. Ct. 2008).

### A.      The RPA is a Loan

Under New York law, "[i]f the transaction is not a loan, there can be no usury, however unconscionable the contract may be." *Seidel v. 18 E. 17th St. Owners*, 598 N.E.2d 7, 11–12 (N.Y. 1992) (internal quotation marks omitted). "When determining whether a transaction is a loan, substance—not form—controls." *Adar Bays*, 179 N.E.3d at 622 (citation omitted); *LG Funding*, 122 N.Y.S.3d at 312 ("[The transaction] must be considered in its totality and judged by its real character, rather than by the name, color, or form which the parties have seen fit to give it" (cleaned up)). New York courts distinguish between loans and sales based on the contract's distribution of risk amongst the parties. *See Haymount Urgent Care PC v. GoFund Advance, LLC*, --- F. Supp. 3d ----, No. 22-CV-1245 (JSR), 2022 WL 2297768, at *6 (S.D.N.Y. June 27, 2022) ("In assessing the substance of financial transactions, the [New York] Court of Appeals has focused on how the contract at issue allocates risk between the parties."); *accord Endico Potatoes, Inc. v. CIT Grp./Factoring, Inc.*, 67 F.3d 1063, 1069 (2d Cir. 1995) ("[T]he root of [the analysis] is the transfer of risk [between the lender and the borrower].")). A loan entails an absolute contractual entitlement for repayment and allocates risk to the borrower; conversely, a sale affords only a conditional right for performance and allocates risk to the buyer. *See LG Funding, LLC*, 122 N.Y.S.3d at 312 ("[The] court must examine whether the [transferor of funds] is absolutely entitled to repayment

under all circumstances[, and if not], the transaction is not a loan."); *accord Major's Furniture Mart, Inc. v. Castle Credit Corp*., 602 F.2d 538, 546 (3d Cir. 1979) ("It is apparent to us that . . . none of the risks present in a true sale [were] present here . . .[.]  Accordingly[,] . . . the true nature of the transaction between [the parties] was a secured loan, not a sale.").  "Usually, courts weigh three factors when determining whether [the right to] repayment is absolute or contingent: (1) whether there is a reconciliation provision in the agreement; (2) whether the agreement has a finite term; and (3) whether there is any recourse should the merchant declare bankruptcy." *LG Funding, LLC*, 122 N.Y.S.3d 309 at 312.

<u>1.</u>    <u>The RPA's Reconciliation Provision Placed the Risk of Default on Defendants</u>

AKF controlled the possibility of reconciliation under the RPA.  The RPA permitted Defendants to seek adjustments of the Alternative Daily Amount, but only (1) once a month through certified mail, (2) if no Event of Default occurred, and (3) after providing Defendants' monthly statements and any other information that AKF in its discretion requested.  (Ex. A, Dkt. 46-5, at 5.)  These conditions effectively made reconciliation under the RPA remote and highly improbable.

First, any reconciliation hinged on Western-1's ability to produce "any [] information"— with no limitation on its scope or amount—that AKF required.  The capacious phrase "any information" allowed AKF to demand materials wholly ancillary to the reconciliation, impossible to obtain, or utterly fanciful.  Nothing in the RPA prohibited AKF from demanding, for example, that Defendants produce a deposition of each of their customers in the past decade, or the birth certificates and marriage licenses of their suppliers.  In effect, the RPA armed AKF with the power to veto any adjustment to the Alternative Daily Amount, and placed the risk associated with any such adjustment on Defendants.  Second, and relatedly, the RPA rendered the possibility of filing

a timely reconciliation request remote.  Defendants, based in California, had a narrow opportunity to apply for reconciliation—only once a month—and must have timely transmitted all of their requests to do so to AKF's offices in New York through "certified mail."  Finally, the RPA defined any failure to pay the daily sum of $888.06 as an irremediable infraction that permanently foreclosed any possibility of future reconciliation.  In sum, as the RPA's provisions made the possibility of reconciliation very unlikely and difficult to obtain, the Court finds that this factor weighs in Defendants' favor, as to finding that the RPA was a loan.

## 2.   The RPA Has a Definite Term

Second, while the RPA states no explicit or definite term, the Court discerns it from the RPA's payment structure.  Barring any reconciliation, the RPA mandated that Defendants deposit $888.06, Monday through Friday, until they paid AKF $130,545.00.  (Ex. A, Dkt. 46-5, at 4–5.)  The term of the RPA was, therefore, roughly 205 days.[8]  *See In re GMI Grp., Inc*., 606 B.R at 488– 89 (determining the payment term based on the "payment schedule" consisting of the number of days until the required amount was paid in full); *Lateral Recovery LLC v. Queen Funding, LLC*, No. 21-CV-9607 (LGS), 2022 WL 2829913, at *6 (S.D.N.Y. July 20, 2022) ("[Although the contract] provides for a seemingly indefinite term, . . . a de facto fixed term plausibly exists. The

---

[8] This period is arrived at by dividing the full amount to be paid—$130,545—by the Alternative Daily Amount of $888.06, which equals roughly 147 daily payments.  Because these payments were only made five days a week, *i.e.*, Monday to Friday, Defendants would have needed about 29 weeks, or 205 days to pay the sum of $130,545 in full.  In section 1.14, the RPA states that deposits must be made only on days when banks would be open, thus seemingly exempting deposits on federal holidays.  (Ex. A, Dkt. 46-5, ₱ 1.14.)  However, the RPA also states that on the next business day after any such holiday, Western-1 would have to deposit the Alternative Daily Amount for that business day, and for the preceding day where the bank was closed (*i.e.*, the federal holiday).  (*Id.*)  Thus, in reality, the RPA neither prolonged or shortened the term of the loan because of federal holidays nor exempted Defendants from paying Plaintiff for these days.

period of payment can be easily calculated by dividing the amount [defendant] owes by the amount of daily payments.").

This factor, therefore, weighs in favor of finding that the RPA was a loan.

> 3.    AKF Had Recourse Under the RPA in the Event of Bankruptcy

The Court finds that the RPA protected AKF in the event Defendants declared bankruptcy. First, the RPA constituted an assignment of Western-1's business lease, collateral which turned AKF into a secured creditor who would retain the lease even if Defendants became bankrupt.  (Dkt. 46-5, ¶ 3.2.)   Second, although the RPA states that if "[Western-1] became bankrupt, *and [Western-1] has not breached the agreement"* (*id.* ¶ 1.2 (emphasis added)), the sum of $130,545 would not be due, it seems virtually certain that AKF would be able to file a claim in the bankruptcy proceeding, as a secured creditor, for the remainder of the $130,545 owed.  That is because a filing of bankruptcy, which invariably involves an actual or projected negative cash stream, automatically stays "any act to obtain possession of property of the [debtor's] estate . . . or to exercise control over property of the estate."  11 U.S.C. § 362(a)(3).  This "provides a debtor with breathing room from the claims of its creditors," and "allows the bankruptcy court to centralize all disputes concerning property of the debtor's estate in the bankruptcy court."  *In re Ionosphere Clubs, Inc*., 922 F.2d 984, 989 (2d Cir. 1990).  The Bankruptcy Code "sets forth a basic system of priority, which ordinarily determines the order in which the bankruptcy court will distribute assets of the estate. Secured creditors are highest on the priority list, for they must receive the proceeds of the collateral that secures their debts."  *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 137 (2017) (citing 11 U.S.C. § 725).  Thus, rather than having no recourse, as a secured creditor, AKF would be "highest on [Defendants'] priority list" in the event of a bankruptcy.  *Id.*

Thus, notwithstanding the purported "disclaimer" in the RPA, AKF had recourse in the event Western-1 became bankrupt, which weighs heavily in favor of finding that the RPA was a loan.

*     *     *

In sum, the Court finds, based on the undisputed evidence and the above weighing of the relevant factors, that the RPA is a loan.

**B.      The RPA Charges a Usurious Interest Rate**

"In determining whether the interest charged exceeded the usury limit, courts must apply the traditional method for calculating the effective interest rate as set forth in *Band Realty Co. v. North Brewster, Inc.*, [335 N.E.2d 316 (N.Y. 1975).]" *Canal v. Munassar*, 41 N.Y.S.3d 828, 829 (App. Div. 2016); *Miller Plan. Corp. with Delta Funding Corp. v. Wells*, 678 N.Y.S.2d 340, 340 (App. Div. 1998) (same); *Advance Servs. Grp. LLC v. Acadian Properties Austin LLC*, 141 N.Y.S.3d 834 (Sup. Ct. 2021) (finding a 49% interest rate to be usurious on a summary judgment motion); *see also* 72 N.Y. Jur. 2d Interest and Usury § 165 ("Whether a usurious rate of interest was exacted [is a question of law when] there is no material conflict in the evidence, and only one conclusion can reasonably be drawn from the facts proved.").

Because all portions of the RPA are undisputed, and correct application of the *Band* formula yields only one reasonable conclusion, the Court proceeds to decide the interest rate.

Although Defendants argue the RPA's interest is 35% (Dkt. 45, at 5), and AKF implies, based on the RPA's "No-Loan" disclaimer, that no interest rate can be deduced (Dkt. 47, at 4 n.2; Dkt. 46, at 8–9), the Court determines the annualized interest rate for the loan to be 125%. Pursuant to the *Band* formula, the "true" annual interest rate is determined by taking the "discount"—*i.e.*, the difference between the amount advanced to the borrower and the amount owed to the lender—

16

dividing that amount by the number of years in the term of the loan, adding that amount to the interest rate stated on the note, and dividing this sum by the difference between the principal and the discount (*i.e.*, the net advance). *Canal*, 41 N.Y.S.3d at 829 ("In applying the [*Band* formula], the discount, divided by the number of years in the term of the [loan], should be added to the amount of interest due in one year, and this sum is compared to the difference between the principal and the discount in order to determine the true interest rate[.]" (internal quotation marks omitted)); *Shifer v. Kelmendi*, 611 N.Y.S.2d 575, 575 (App. Div. 1994) (applying the *Band Realty Co.* formula); *see Band Realty Co. v. North Brewster, Inc.*, 335 N.E.2d 316, 317–18 (N.Y. 1975) (stating that "discount" for a loan in the amount of $300,000, where the lender advanced $261,000, to be $39,000); *Bakhash v. Winston*, 19 N.Y.S.3d 887, 887 (App. Div. 2015) ("Where, as here, the loan is for less than a year, the interest rate is annualized[.]")[9]; *Boswick v. Bronte SPV LLC*, 114 N.Y.S.3d 192 (Sup. Ct. 2019) ("Fees, including loan origination fees, which are deemed interest for the purposes of determining whether an interest rate charged exceeds the usury limit, are annualized[.]").

Here, AKF advanced $93,614 to receive back $130,545, generating a discount of $36,931. The sum of $130,545 is the "principal." *See Canal*, 41 N.Y.S.3d at 829 (finding that in a mortgage where $127,000 was disbursed to a borrower in return for a payment of $170,000, "the principal . . . [was] $170,000."). The RPA, on its face, states that it charges no interest. *See id.* (determining the amount of interest to be 0% when the contract "state[d] that the interest rate during the term of the note would be zero[.]" (cleaned up)). The term of the loan under the RPA was 205 days. *See*

---

[9] As previously discussed, although the RPA does not specify a term, the effective term is approximately 205 days based on the amount of time necessary to repay the $130,545.00 owed to AKF using the Alternative Daily Amount method.

*In re GMI Grp., Inc.*, 606 B.R at 488–89 (calculating interest using the number of days until payment was due as the term of the loan).

Thus, the *Band* formula reveals that the RPA charged 70.2% in effective interest:

$$\frac{\text{Discount (36,931)}}{\text{Term of Loan in Years}\ \left(\frac{205}{365}\right)} + \text{ Interest on the Note (0\%)} = \$65,755.19$$

$$\frac{65,755.19}{\text{Principal (130,545)} - \text{Discount (36,931)} = 93,614\ \text{(Net Advance)}} = 70.2\%$$

Because the term of the loan equals 205 days, or slightly below 7 months, it must be annualized. *See Bakhash*, 19 N.Y.S.3d at 887 ("annualizing" a 4-month loan by multiplying it three times). Therefore, the final effective interest rate is nearly 125%:

$$\frac{\text{Duration of a Year (365)}}{\text{Term of Loan out of the Year (205)}} \times \text{ Effective Interest (70.2)} = 125\%$$

Because the effective interest rate exceeds the statutory maximum of 25% by a magnitude of five times, it is patently usurious.

### C.   Usurious Intent is Imputed

Usurious intent is the volitional decision "to charge [an interest other] than the legal rate as evidenced by the [contract]," not any actual subjective motivation "to violate the usury statute." *Matter of Dane's Est.*, 390 N.Y.S.2d 249, 250 (App. Div. 1976); *Freitas v. Geddes Sav. & Loan Ass'n*, 471 N.E.2d 437, 443 (N.Y. 1984) (same).   When a transaction's usurious nature is equivocal, usurious intent is a factual question for the jury; conversely, when a transaction's usurious nature is obvious, usurious intent is imputed as a matter of law.  *See Fiedler v. Darrin*, 50 N.Y. 437, 443 (N.Y. 1872) ("[W]hen an act is equivocal in its character, the intent must be ascertained . . . [b]ut when an act is illegal the intent of the offender is immaterial."); *Hartley*, 222 N.Y. at 187 ( "[intent can be established either when the] parties intend to evade the usury statutes

of the state, or [when] the interest payable so large that. . . an intent . . . will necessarily be imputed to them[.]"); *Blue Wolf*, 961 N.Y.S.2d at 89 ("If usury can be gleaned from the face of an instrument, intent will be implied and usury will be found as a matter of law."); *accord Lloyd v. Scott,* 29 U.S. 205, 216 (1830) ("The [usurious] intention of the parties is a legal inference from established facts."); *De Korwin v. First Nat. Bank of Chicago*, 275 F.2d 755, 762 (7th Cir. 1960) (same).

The New York Court of Appeals has articulated two tests for identifying transactions so patently usurious such that usurious intent is imputed as a matter of law.  The first is the 'usurious effect' test, focusing on the transaction's usurious consequences.  *See Fiedler*, 50 N.Y. at 443 ("The effect of the transaction was to secure the plaintiff more than [the statutory maximum] for the loan.  The agreement was vicious because of the usurious effect, *by which the intent of the parties must be judged*" (emphasis added)); *Seymour v. Strong*, 4 Hill 255 (N.Y. Sup. Ct. 1843) ("The [transaction had a] usurious effect, by which the intent of the parties must be judged[.]") (New York's highest court before 1846); *Hall v. Earnest*, 36 Barb. 585 (N.Y. Sup. Ct. 1861) ("The argument that there can be no usury . . . when the party [executing] the paper is ignorant [of its character], and is in fact [told by others that the paper is legal], is not sound if the legal effect of the transaction involves a usurious agreement[.]").  The second, stemming from the *Freitas* decision, is the 'usurious on its face' test which asks whether the usury, usually the interest rate itself, "appear[s] on the face of the note[.]"  *See* 471 N.E.2d at 443 (finding that usurious intent could not be imputed to a mortgagee charging more than the lawful sum of interest, because the contract stated only a lawful amount of interest and the mortgagee inadvertently labelled and charged inspection services as fees and thereby elevated the interest amount); *Greenfield v. Skydell*, 588 N.Y.S.2d 185, 185 (App. Div. 1992) ("[I]n this case, no stated rate of interest appears

19

upon the face of the note[;] . . . [thus t]o establish usury, facts extrinsic to the document must be referred to."); *AJW Partners, LLC v. Cyberlux Corp*, 873 N.Y.S.2d 231 (Sup. Ct. 2008) (same). "[B]ecause a usurer usually seeks to conceal the usury, and to accomplish the purpose by indirect methods, questions of usurious intent . . . are typically questions of fact[.]" *Adar Bays,* 179 N.E.3d at 625 (cleaned up).

Here, the Court need look no further than the effective interest rate under the RPA. Because the RPA is patently usurious, intent can be imputed under either test. First, under the usurious effect test, the transaction readily allows imputation of intent. Against collateral that included the Receipts and Western-1's business lease, AKF loaned money at 125 % interest, which far exceeds the statutory limit. Thus, "the interest payable [is] so large" that "intent to provide for the payment of interest beyond the legal rate will necessarily be imputed[.]" *See Fiedler*, 50 N.Y. at 443. Second, under the facial test, the usurious nature of the transaction is readily visible from the contract, notwithstanding the RPA's boilerplate disclaimers that it is "not a loan" and charges no interest.[10] Although the New York Court of Appeals has not considered the effect of disclaimers of the kind the RPA contains, existing law sufficiently guides the Court. Under New York law, maneuvers of denial inserted into a contract do not automatically render it non-usurious. *See Simsbury Fund, Inc. v. New St. Louis Assocs.*, 611 N.Y.S.2d 557, 558 (App. Div. 1994) ("[L]anguage [in the contract] purporting to reduce the interest rate to the legal rate in the event of a finding of usury, do[es] not make [it] nonusurious."); *Bakhash*, 19 N.Y.S.3d at 887 ("[Although] the note says, 'in no event shall the rate of interest . . . exceed [25%] and any interest paid in excess

---

[10] Although Dr. Rhee's assertions are irrelevant to the analysis, the Court notes that Dr. Rhee in his deposition stated that he could not remember whether he ever read the RPA before signing it. (*See* Dr. Rhee Dep., Dkt. 46-6, 122:17–20.) The RPA itself includes generic terms, such as "FUNDER" and "MERCHANT," and appears to be a boilerplate instrument. (*See generally* Dkt. 46-5.)

of [25%] shall be. . . refunded[,]s . . . that does not make the [contract] nonsurious[.]").  Instead, the New York Appellate Division recently opined that intent may be imputed when a court can "glean[]" the usury "from the face of an instrument."  *Blue Wolf*, 961 N.Y.S.2d at 89.  Indeed, in *Freitas,* the New York Court of Appeals cited *Giventer v. Arnow*, 333 N.E.2d 366 (N.Y. 1975) as an example of a loan instrument which was facially usurious.  In *Giventer*, "[a]t the time the [contract] was executed, the maximum rate of interest was fixed at 7.50 [%] per annum," and the contract provided for an "interest at 7[.50%] [p]er annum, [to be] comp[o]unded quarterly[.]"  *Id.* at 367.  Despite compounding the interest on a quarterly basis, the contract provided that no payment was due until after one year.  *Id.* at 368.  By the point payment was actually due, "the effective [compounded] annual rate would be 7.72[%]."  *Id.* at 367.  The operation of the contract rendered the provision "merely a way of expressing an interest rate of 7.72%" at the time of payment, and the court refused to allow "a convenient hedging device for avoiding the more severe penalties of the usury statute."  *Id.* at 368–69; *see also Blue Wolf*, 961 N.Y.S.2d at 90 (applying the facial test and finding that plaintiff "successfully asserted" usury when the true interest rate of an agreement stating only "12% of interest" was 36.09%).

Here, unlike the *Freitas* contract that stated a lawful interest amount that only a banker's extra-contractual clerical error increased*,* it is the RPA's language itself that spells usury.  From the four corners of the contract, the Court gleans a loan at an interest rate five times the statutory limit, ostensibly backed by collateral.  As in *Giventer*, the language of the contract itself—*i.e.,* the transfer of $93,614 in return for $130,545 paid under demanding conditions, including an implicit term of slightly over six months—"was merely a way of expressing" a loan at a grossly usurious rate.  The existence of a single boilerplate disclaimer, that may have also appeared in a footnote or printed in small letters on the back of the RPA, does not mean that the usury simply fades away

from the RPA's "very face" or that the unlawful intent is no longer "apparent[.]"  *See Condit v. Baldwin*, 21 N.Y. 219, 221 (1860).   Thus, the Court imputes usurious intent as a matter of law.

\*      \*      \*

In sum, the Court finds that Defendants have successfully established the defense of usury, as a matter of law, and that therefore Plaintiff's summary judgment motion as to both its breach of contract and guaranty claims must be denied.

## IV.   Defendant's Successful Usury Defense Invalidates Plaintiff's Breach of Contract and Guaranty Claims

Because the Court has found that Defendants have established their usury defense as a matter of law, the question is what impact that finding has on Plaintiff's breach of contract and guaranty claims beyond requiring the denial of Plaintiff's summary judgment motion on those claims.  Sitting in diversity, the Court "must predict how [a] state's highest court would resolve a question of state law."  *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 402–03 (2d Cir. 2000) (citation omitted).   Based on this analysis, the Court concludes that Plaintiff's breach of contract and guaranty claims must dismissed.

It was once an open question under New York law whether a successful defense of criminal usury eliminates the borrower's obligations to pay back the loan.  *See Venture Mortgage Fund, L.P. v. Schmutz*, 282 F.3d 185, 189 (2d Cir. 2002); *Am. Equities Grp., Inc. v. Ahava Dairy Prods. Corp.*, No. 1-CV-5207 (RWS), 2007 WL 4563487, at \*5 (S.D.N.Y. Dec. 18, 2007).  However, last year, in response to a certified question, the New York Court of Appeals opined that "loans proven to violate the criminal usury statute are subject to the same consequence as any other usurious loans: complete invalidity of the loan instrument."  *Adar Bays*, 179 N.E.3d at 621; *see also Seidel*, 598 N.E.2d at 9 ("[T]he borrower can simply keep the borrowed funds and walk away from the agreement.").   Thus, affording dispositive weight to the New York Court of Appeals' opinions,

*see Pinto*, 221 F.3d at 402–03, the Court finds that the RPA—and by extension, the guaranty—are invalid and unenforceable.

## CONCLUSION

For the foregoing reasons, the Court denies Plaintiff's partial motion for summary judgment and dismisses Plaintiff's claims for breach of contract and guaranty.  By October 28, 2022, the parties shall file a joint pre-trial briefing schedule as to the remaining claims in the Complaint.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: September 28, 2022
         Brooklyn, New York

23